825 A.2d 1192 (2003)
361 N.J. Super. 448
Giselle CHRISANTHIS, Plaintiff-Appellant,
v.
COUNTY OF ATLANTIC, Defendant-Respondent, and
Correctional Healthcare Solutions and Sean Thomas, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued May 21, 2003.
Decided June 30, 2003.
*1193 Carl D. Poplar, Turnersville, argued the cause for appellant (Mr. Poplar and Genora Rosypal; attorneys; Rebecca J. Bertram, on the brief).
Arthur J. Murray, West Long Branch, argued the cause for respondent (Jacobs & Barbone, attorneys; Edwin J. Jacobs, Jr. and Donna P. Taylor, of counsel; Mr. Murray, on the brief).
Before Judges KING, LISA and FUENTES.
The opinion of the court was delivered by LISA, J.A.D.
Pursuant to the terms of an agreement between defendant Correctional Healthcare Solutions, Inc. (CHS), and defendant Atlantic County (County), CHS provided healthcare services to inmates incarcerated at the Atlantic County Justice Facility (Facility). Plaintiff Giselle Chrisanthis is a licensed practical nurse who was employed by CHS to provide services at the Facility. Plaintiff alleged that, during the course of her employment, she was sexually harassed by defendant Sean Thomas, who was a supervising corrections officer employed by the County.
Plaintiff brought an action under the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 to -49(LAD), against the County, Thomas, and CHS, seeking money damages for "hostile work environment sexual harassment." Judge Higbee granted the County's and Thomas's motions for summary judgment. The sole issue on appeal pertains to the summary judgment motion granted in favor of the County. After summary judgment was granted, plaintiff and Thomas entered into a stipulation of dismissal, dismissing with prejudice all claims, including Thomas's counterclaims, they had against each other. Plaintiff then entered into a consent order dismissing without prejudice her claims against CHS.[1] Recognizing that the LAD applies to employer-employee relationships only and does not protect independent contractors, the judge determined that the proofs were insufficient to establish an employment relationship between plaintiff and the County to support LAD liability. Plaintiff appeals, contending she presented sufficient evidence to withstand summary judgment and the issue, for LAD purposes, of County employment, should have been presented to the trier-of-fact. We disagree with plaintiff and affirm.

I
Located in Mays Landing, the Facility is a "maximum, medium and minimum detention facility" that houses sentenced and pre-sentenced men and women. The jail population averages about 975 persons who require medical, dental and mental health services. During 1995 and earlier, the nursing component of these services was performed by County employees.
On September 27, 1995, the County issued a Request For Proposals (RFP), inviting health care contractors to submit proposals to perform medical, dental and mental health services at the Facility beginning on January 1, 1996. The RFP outlined the County's requirements for *1194 services and specified that the "Health Care Contractor is at all times hereunder acting and performing as an independent contractor to coordinate the provision of professional services within the scope of the authority conferred by this Agreement."
The RFP also contained a provision concerning "County Satisfaction with Health Care Personnel," which stated:
If the County should become dissatisfied with any health care personnel and/or subcontractor provided by the Health Care Contractor, the Contractor, in recognition of the sensitive nature of correctional services, shall, following receipt of written notice from the County of its dissatisfaction and the reasons thereof, exercise its best efforts to resolve the problem and, if the problem is not resolved, remove the individual about whom the County has expressed its dissatisfaction. The Contractor will be allowed a reasonable time prior to removal to find an acceptable replacement.
In response to the County's RFP, CHS submitted a proposal detailing its plan to provide the requested services. CHS's proposal specified that it would hire personnel to provide the services, subject to "Atlantic County's approval," which evidently meant that the prospective CHS employee was "required to pass investigations conducted" by the Facility. The proposal also provided that CHS would purchase and maintain all necessary medical and pharmaceutical supplies and equipment.
CHS was awarded the bid, and on December 29, 1995, the County and CHS entered into a contract for provision of medical, dental, and mental health services at the Facility commencing on January 1, 1996. This was a one-year contract, with two one-year renewal options by the County. The contract, by its terms, incorporated the County's RFP and CHS's proposal. The contract provided that CHS's "status shall be that of an independent principal and not as agent or employee of the County."
Plaintiff is a licensed practical nurse. On October 8, 1996, she was hired by CHS to provide medical services at the Facility. Plaintiff was given a CHS employee handbook, which specified her role as a CHS employee at the Facility, including pay, benefits, and CHS's performance appraisals and disciplinary procedures. The handbook recited that CHS medical employees were "guests" of the Facility and that, as such, they were to observe the "rules of security." The handbook also stated that CHS was sometimes requested by a client "to terminate an employee who is unacceptable ... or violates their rules and regulations. Under such circumstances, the [CHS] employee may be asked to immediately surrender his/her identification badge and be escorted off of the premises and/or permanently barred."
Plaintiff worked at the Facility on a part-time basis during 1996, 1997, and 1998. During this period, she received favorable performance appraisals from her CHS supervisors, but was also issued a written warning by those supervisors concerning her excessive absenteeism. On May 20, 1999, plaintiff completed a "Position Description" form with her CHS supervisor, in which she specified the numerous duties required of her job at the Facility. The form is noteworthy because, in completing it, plaintiff essentially acknowledged her role as a CHS employee who provided "nursing care within the correctional facility;" she did not assert in any way that her job constituted County employment.
When she began her employment with CHS at the Facility in 1996, plaintiff became acquainted with Thomas, a County employee occupying the position of corrections *1195 officer and holding the rank of sergeant. By 1999, Thomas had been promoted to the rank of lieutenant. According to plaintiff, on June 21 and July 7, 1999, Thomas touched her in a sexually inappropriate manner, against her wishes, in pursuit of sexual favors. Plaintiff reported the incidents, and Thomas's superiors at the Facility conducted an investigation which concluded on September 27, 1999 the allegations were "not sustained."
On August 16, 1999, the County's Equal Employment Opportunity Office (EEO), began an investigation into plaintiff's complaint of sexual harassment pursuant to a County policy concerning such allegations against its employees. The County's EEO officer, Susan L. Gross, issued a report, on January 11, 2000, in which she concluded that "[t]here is insufficient credible evidence to substantiate the allegations of sexual contact [made] by ... [plaintiff] against Sgt. Thomas."
On December 13, 1999, CHS sent plaintiff a letter notifying her that on December 31, 1999 CHS's contract with the County would terminate and that, as a result, "your employment with CHS will cease as of that date." The motion record establishes that plaintiff knew of no one employed by the County who was responsible for terminating her from her employment with CHS. Thereafter, plaintiff appears to have been immediately hired by Prison Health Solutions (PHS), an independent healthcare provider unrelated to CHS, to provide the same nursing services at the Facility that she provided when she was employed by CHS. However, plaintiff was evidently employed by PHS on an "as needed" basis, and PHS never requested her services. According to plaintiff, PHS had been advised by someone in authority at the Facility that she was not to be called for work and was not permitted on the premises of the Facility.

II
The LAD prohibits employment discrimination, including sexual harassment, by an "employer." N.J.S.A. 10:5-12a. However, the LAD's definition of "employee" states only that it "does not include any individual employed in the domestic service of any person." N.J.S.A. 10:5-5f. The relatively undefined term raises the issue of who is an "employee" and thus protected by the LAD.
In Carney v. Dexter Shoe Co., 701 F.Supp. 1093, 1101-03 (D.N.J.1988), the district court concluded that, because the plaintiff shoe salesman was an "independent contractor," he was not an "employee" of the defendant shoe manufacturer and thus his LAD-based claim for age discrimination failed as a matter of law.
In Pukowsky v. Caruso, 312 N.J.Super. 171, 177-80, 711 A.2d 398 (App.Div.1998), we found, based on our review of judicial interpretations (including Carney) of comparable federal and state anti-discrimination statutes, that "independent contractors are not to be considered `employees' within the meaning of the LAD, and are therefore not entitled to avail themselves of its protections." Plaintiff cannot and does not deny she was an employee of CHS. She asserts she had a "dual employer relationship" with both CHS and the County, resulting mainly from the County's control over her work for CHS at the Facility. Kurdyla v. Pinkerton Sec., 197 F.R.D. 128, 134 (D.N.J.2000) ("A plaintiff may be an employee of more than one entity. Courts have recognized that an individual may be an employee of multiple employers under a particular statute, including anti-discrimination enactments."); Hebard v. Basking Ridge Fire Co. No. 1, 164 N.J.Super. 77, 83-84, 395 A.2d 870 (App.Div.1978), appeal dismissed, 81 N.J. 294, 405 A.2d 838 (1979) (indicating in a LAD case that "[t]hese indicia of control, *1196 both fiscal and supervisory, warrant the conclusion that the members of the company are, in effect, employees of the township, as well as of the company, notwithstanding the fact that the members are not paid").
Whether plaintiff can be considered a County employee for LAD purposes requires application of a twelve-factor test. Pukowsky, supra, 312 N.J.Super. at 182-83, 711 A.2d 398. This test was derived from the test set out in Franz v. Raymond Eisenhardt & Sons, Inc., 732 F.Supp. 521, 528 (D.N.J.1990), which was itself taken from the test used in E.E.O.C. v. Zippo Mfg. Co., 713 F.2d 32, 37 (3d Cir.1983). As we stated in Pukowsky, the federal courts have developed a number of tests to interpret statutes that contain the word "employee," but do not adequately define the term. Pukowsky, supra, 312 N.J.Super. at 182, 711 A.2d 398. "All of these tests are substantially similar to the test which was developed by the Third Circuit in Zippo and applied [by the district court in New Jersey] in Carney." Ibid.; see DaBronzo v. Roche Vitamins, Inc., 232 F.Supp.2d 306, 315-17 (D.N.J.2002) (describing concisely the similarities and differences among the various federal tests); Kurdyla, supra, 197 F.R.D. at 133 n. 13; Walker v. Correctional Med. Sys., 886 F.Supp. 515, 520-22 (W.D.Pa.1995). These are the factors in what we will refer to as the Pukowsky test:
(1) the employer's right to control the means and manner of the worker's performance; (2) the kind of occupation supervised or unsupervised; (3) skill; (4) who furnishes the equipment and workplace; (5) the length of time in which the individual has worked; (6) the method of payment; (7) the manner of termination of the work relationship; (8) whether there is annual leave; (9) whether the work is an integral part of the business of the "employer;" (10) whether the worker accrues retirement benefits; (11) whether the "employer" pays social security taxes; and (12) the intention of the parties.
[Pukowsky, supra, 312 N.J.Super. at 182-83, 711 A.2d 398.]
"The most important of these factors is the first, the employer's right to control the means and manner of the worker's performance." Franz, supra, 732 F.Supp. at 528; accord Walker, supra, 886 F.Supp. at 521; Carney, supra, 701 F.Supp. at 1098.
Applying the Pukowsky test to the facts before us, it is readily apparent that eight of the factors plainly indicate that plaintiff was not a County employee. There is little dispute that plaintiff's activities as a nurse were always supervised by a CHS nursing manager and not by a County employee during her employment at the Facility. As recognized by the trial judge, the "bottom line is her work was as a nurse and the County did not direct how she could nurse." (Factor 2) Plaintiff held the skilled position of a licensed practical nurse, a skill not possessed by County employees at the Facility. This dissimilarity in job skills weighs in favor of classifying plaintiff as an employee of the independent contractor (CHS) and not as a County employee. (Factor 3) DaBronzo, supra, 232 F.Supp.2d at 317 (where the court concluded under Factor 3 that the removal of asbestos was a specialized job skill possessed by the employees of an independent contractor and not by the employees of a vitamin manufacturer).
Plaintiff was employed as a nurse at the Facility only for about three years. This relatively brief period of employment militates against finding her to be a County employee, whose term of employment at a defined job position could reasonably be expected to have lasted longer. (Factor 5) DaBronzo, supra, 232 F.Supp.2d at 317 (where the court determined that the thirty-year *1197 span of employment of an asbestos-removal worker indicated that he was more readily classifiable as an employee than as an independent contractor). Plaintiff was hired by CHS, paid by CHS, provided vacation, insurance, and retirement benefits by CHS, and had the employer's portion of her Social Security taxes paid by CHS. (Factors 6, 8, 10 and 11).
The most apparent expression of the intention of the parties is contained in the contract between them and in the County's RFP, which was made part of that contract. Both documents specify that the selected Health Care Contractor (CHS) is to act as an "independent contractor" who provides medical services to the Facility. (Factor 12)
Although eight of the twelve factors plainly indicate that plaintiff was employed by an independent contractor and could not therefore be considered a County employee for purposes of establishing liability under the LAD, the Pukowsky test requires more than the listing of factors on either side of the ledger with victory going to the side garnering the most factors. A "principled application" of the factors and a consideration of which factors are more important under the peculiar circumstances of each case are required. Pukowsky, supra, 312 N.J.Super. at 183, 711 A.2d 398; Carney, supra, 701 F.Supp. at 1099 ("Where there exist several indicia of employee status, the mere presence or absence of two or three of themwithout a reasoned balancing of the above factors cannot dictate the outcome of a summary judgment motion"). We address the remaining four factors mindful of this consideration.
Factor 4 concerns who furnishes the equipment and workplace. The contract between CHS and the County provided that CHS would purchase and maintain all necessary medical and pharmaceutical supplies and equipment. Because employers usually provide all supplies and equipment needed by their employees, this factor appears to weigh in favor of classifying CHS as an independent contractor and thus disqualifying plaintiff from classification as a County employee. However, the factor includes a workplace component and, because plaintiff performed all of her services at the Facility, the County obviously furnished plaintiff's workplace.
In Walker, a nurse, who was employed by an independent contractor healthcare provider to work at a county jail, filed a federal suit against the county under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. § 2000e, et seq., alleging racially discriminatory application of security policies by the jail's management. Walker, supra, 886 F.Supp. at 518-19. To establish the county's liability, the nurse asserted that she was, in effect, an employee of the county because of the control exercised by the county over her work. Id. at 519-24. In response, the county asserted that she was an independent contractor and thus not protected under the federal statute. Ibid. In determining that the plaintiff-nurse should not be classified as an independent contractor and that her complaint should not be dismissed on summary judgment on that ground, the court reasoned that the "workplace" factor supported the plaintiff's assertion that she was a county employee because the plaintiff "always reported to the Jail, and all her work was performed there." Id. at 521.
The trial judge in our case refused to attach any significance to the fact that the County provided the Facility as plaintiff's workplace, observing that "most independent contractors work somewhere else;" that is, they perform their jobs in places not under their control. The judge noted that the plaintiff in Pukowsky worked at a skating rink owned and controlled by *1198 someone else. In Pukowsky, we did not consider that circumstance as weighing in favor of classifying the plaintiff as an employee of the rink and, instead, determined that the plaintiff was an independent contractor. Pukowsky, supra, 312 N.J.Super. at 183, 711 A.2d 398; see also DaBronzo, supra, 232 F.Supp.2d at 317 (determining that the fourth factor indicated that the plaintiff was an independent contractor, the court essentially ignored the fact that the manufacturer furnished the plaintiff's workplace, but relied instead on a contract provision requiring the plaintiff's employer to furnish all equipment and supplies).
CHS describes itself as a "physician-owned health care management organization serving today's correctional market." Its business is to provide health care workers to correctional facilities to provide health care services to inmates. Naturally, CHS's employees work at an assigned correctional facility. To paraphrase Willie Sutton, it's where the inmates are.[2] Under the circumstances of this case, the furnishing of a workplace by the owner of the correctional facility is a necessary part of the contractual arrangement. This reduces any weight attributable to this factor. It does not nullify the factor. If, for example, an organization such as CHS sent its employees to different correctional facilities at different times, the workplace component of this factor might be eliminated completely. But where an employee, such as plaintiff in this case, is hired for the specific purpose of working at a particular location, and that location is, as a matter of fact, her exclusive workplace, this component comes into play. Overall, it is entitled to only low relative weight.
In Walker, the court mentioned the workplace factor as favoring county employment, but gave no analysis and ascribed no relative weight to that factor. Walker, supra, 886 F.Supp. at 521. It is evident that the factor to which the court ascribed the greatest weight in finding that a material issue of fact existed as to whether the plaintiff was a county employee was Factor 1, the right of control, the most important factor, ibid., which we will discuss later in this opinion. We are satisfied that Factor 4 weighs heavily, although not entirely, in favor of independent contractor status.
Factor 7 concerns the manner of termination of the work relationship. Contrary to plaintiff's argument, the County did not terminate plaintiff's employment with CHS. The County's contract with CHS expired on December 31, 1999, and CHS terminated plaintiff's employment as of that date. Thus, on its face, the circumstances surrounding the ending of plaintiff's "work relationship" at the Facility indicate only that the independent contractor (CHS) lost the County contract to provide medical services at the Facility and that it discharged its employees as a result of the contract's expiration. Nothing suggests that, because of that circumstance, plaintiff must be classified as a County employee and not as an employee of the independent contractor (CHS).
Plaintiff, however, appears to assert that the County, by "terminating her security clearance" following her termination by CHS, effectively prevented her from enjoying a work relationship as an employee of PHS, which was CHS's successor as the health care contractor at the Facility. According to plaintiff, because she lacked a security clearance, she was never called by PHS for an assignment at the Facility. This turn of events could be viewed under Factor 7 as an exercise of control by the *1199 County over plaintiff's employment through its effective disruption of plaintiff's work relationship with PHS.
On a related issue, plaintiff argues that the provision in the County's RFP allowing for the removal of a CHS employee if the County is "dissatisfied" with that employee, also shows control by the County over plaintiff's work relationship with CHS. This degree of control encompasses the possible termination of that relationship based on the amorphous concept of "dissatisfaction." This contract provision could also implicate Factor 7. The DaBronzo decision suggests otherwise, however.
In DaBronzo, an asbestos removal worker, who was employed by an independent contractor and working at a vitamin manufacturer's plant, brought an action against the manufacturer under the Conscientious Employee Protection Act, N.J.S.A. 34:19-1 to -8 (CEPA). DaBronzo, supra, 232 F.Supp.2d at 307-09. The worker was barred by the manufacturer from entering the plant's premises and was thereafter fired by his contractor-employer. Ibid. In determining that the worker could not sue the manufacturer under CEPA because he was not the manufacturer's employee but only an independent contractor, the court relied very heavily upon the rationale of Pukowsky. DaBronzo, supra, 232 F.Supp.2d at 312-14.
In considering Factor 7, the court in DaBronzo noted that the vitamin manufacturer's contract with the worker's contractor-employer contained a provision allowing the manufacturer to "remove" from the manufacturer's premises any of the contractor's workers that the manufacturer "deems incompetent or a hindrance to the proper progress of work." Id. at 317-18. The provision further stated that the manufacturer's written consent would be required before the removed employee would be allowed to return. Ibid. The provision did not empower the manufacturer to fire the contractor's employee. Id. at 319.
The contract provision in DaBronzo is similar to the one in the County's RFP, which allowed for the exclusion of CHS workers if the County became "dissatisfied" with them. Also similar is the circumstance that the RFP's "dissatisfaction" provision did not expressly empower the County to terminate the workers' employment with CHS. Additionally, the vitamin manufacturer's requirement for its written consent before a removed worker could be readmitted to the manufacturer's premises is similar to the withdrawal of plaintiff's security clearance for entry into the Facility. That is, the County effectively withdrew its consent for plaintiff's entry to the Facility and would have had to give such consent again before plaintiff could begin her work for PHS at the Facility.
In DaBronzo, the court determined essentially that, because the contractor-employer retained the "ultimate authority" to terminate the worker from its employ, the manufacturer did not exert sufficient control over the contractor-employer's termination decision to trigger the worker's classification as the manufacturer's employee under Factor 7. Ibid. The court stressed that "the contract speaks only to... [the manufacturer's] right to remove an employee from the work site," and not to any right by the manufacturer to actually terminate the worker's employment. Id. at 318. The same is true here. The RFP's "dissatisfaction" provision only allowed the removal of a CHS employee by the County and did not require the termination of that employee's employment by CHS.
Thus, in DaBronzo, the manufacturer's act of barring the worker from its premises pursuant to a contract provision did not function to make the worker an employee *1200 of the manufacturer for purposes of establishing CEPA liability. Similarly, neither the presence of the "dissatisfaction" provision in the County's RFP, nor the withdrawal of plaintiff's security clearance by the County, should function to make plaintiff an employee of the County for purposes of establishing liability under the LAD.
Another circumstance that weighed in the court's decision in DaBronzo was that the "Plaintiff has submitted no evidence that ... [the contractor-employer] could not have employed him at another work site or in another capacity," rather than terminating his employment after he was barred from the manufacturer's premises. Ibid. The situation is similar here. Plaintiff has presented no evidence showing that PHS cannot employ her as a nurse at another job site or in another job capacity. The record is very scant concerning PHS and its dealings with the County and with plaintiff. PHS is not a party in this litigation. This dearth of proof undermines plaintiff's argument concerning her lockout from the Facility during her employment by PHS. We conclude that Factor 7 indicates that plaintiff was the employee of the independent contractor (CHS) and not a County employee.
Factor 9 concerns whether the work is an integral part of the business of the "employer." We find unpersuasive plaintiff's argument that because a correctional facility is legally required to provide health services to inmates, that function is an integral part of its business. We agree with Judge Higbee's finding that the "most central business of the County was to imprison and control convicted criminals. Secondary to this [the County] had to, of course, provide laundry, food and medical services but this is not the primary function of the facility." Plaintiff presents no authority requiring the County to utilize County employees to provide medical services to the inmates at the Facility. Provision of medical services to inmates is an incidental, not integral, function of the Facility. Factor 9 indicates that plaintiff was functioning as the employee of an independent contractor and not as a County employee.
Factor 1, the most important factor, concerns the employer's right to control the means and manner of the worker's performance. The trial judge rejected plaintiff's contention that the County controlled her job performance to such an extent that she should be considered a County employee for LAD purposes. The judge reasoned that, while the County necessarily controlled access and movement throughout the Facility for security reasons, "[t]hese security type measures apply to anyone who enters the jail and don't create an employer/employee relationship." Instead, the "bottom line is her work was as a nurse and the County did not direct how she could nurse." We agree.
Plaintiff relies heavily on Walker in contending that the County's exercise of control over her activities as a nurse at the Facility was so substantial that she should be classified as a County employee for LAD purposes. This reliance is unpersuasive.
In Walker, the district court considered a "control" factor identical to Pukowsky Factor 1 in the course of determining whether the nurse there was an independent contractor or a county employee. Walker, supra, 886 F.Supp. at 520-21. The court determined that the nurse could be considered a county employee for liability purposes under Title VII because of contract provisions explicitly setting out such control. The specific contract language the court relied on provided that CMS, the health-care independent contractor *1201 shall perform as directed by the ... Warden or his designee. Warden shall limit his directives to matters pertaining to: termination of CMS personnel ...; calling meetings, and security matters; and directing CMS to examine a specific inmate. However, CMS shall perform in accordance with the Warden's directives regardless of whether CMS perceives said directives to be beyond the Warden's authority.

[Id. at 521.]
The contract thus provided for the Warden's direct control over the independent contractor's nursing functions at the jail. Included among those control elements were the "right to terminate" the contractor's personnel, as well as the right "to assign additional duties" and the right to direct the provision of medical services to a particular inmate. Ibid. The court viewed these express contractual rights as sufficient proof of control by the county to support an inference that the plaintiff-nurse was a county employee for liability purposes under Title VII. Ibid.
The case before us is different. The contract between the County and CHS did not include express provisions like those in Walker, granting the County the right to terminate, assign, or direct CHS employees. Thus, Walker does not support a finding that plaintiff should be considered a County employee under Factor 1.
DaBronzo is also unavailing. In DaBronzo, the plaintiff asserted that the vitamin manufacturer "controlled the means and manner of employment and supervised his work," pointing to specific control provisions of the contract between the manufacturer and his contractor-employer, as well as the fact that the manufacturer "mandated compliance with its standard operating procedures and oversaw plaintiff's completion of his work." DaBronzo, supra, 232 F.Supp.2d at 316-17. The court rejected this argument, reasoning that, because the plaintiff "independently exercised his expertise in removing and handling asbestos," the "first factor does not weigh in favor of either party." Id. at 317.
Unlike the situation in DaBronzo, there are no contract provisions in the contract between the County and CHS giving the County the kind of control that the vitamin manufacturer had over the DaBronzo plaintiff. Like the situation in DaBronzo, the proofs show that plaintiff in the case before us independently exercised her expertise as a nurse in performing her job at the Facility.
In rejecting the DaBronzo plaintiff's argument concerning the manufacturer's "mandated compliance with its standard operating procedures" and its oversight of the completion of the plaintiff's work, the court found that "there were some indicia of control or supervision by [the manufacturer], but that this supervision was limited to ensuring compliance with safety procedures, promoting efficiency, managing its budget, establishing administrative processes, and maintaining control over its premises." Ibid.
In our case, most of the control measures that plaintiff asserts were exercised over her by the County may fairly be characterized as the County's efforts to ensure compliance with its safety and security procedures at the Facility and to maintain control over the Facility's premises. As in DaBronzo, such efforts by the County do not result in an exercise of control under Factor 1 sufficient to turn plaintiff into a County employee for LAD purposes.
The "control" considerations underlying Factor 1 indicate that plaintiff was not a County employee, but that she was an employee of independent contractor CHS.
In reviewing a trial court's grant of summary judgment, we employ "the same *1202 standard that governs trial courts in determining whether summary judgment was properly granted." Johnson v. Schragger, Lavine, Nagy & Krasny, 340 N.J.Super. 84, 89, 773 A.2d 1164 (App.Div.2001). Thus we view the facts in a light most favorable to the non-moving party, giving that party the benefit of all inferences that may be drawn in his or her favor, and determine whether those facts are "sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995); Johnson, supra, 340 N.J.Super. at 89-90, 773 A.2d 1164; see R. 4:46-2(c).
Absolute and clear-cut unanimity on all twelve Pukowsky factors is not required to support summary judgment. In Zippo, supra, 713 F.2d at 38, the court held that although the length of time plaintiffs worked as district managers and their exclusive product arrangement and economic dependence are indicative of employee status, the presence of those factors, when balanced against other factors strongly supporting independent contractor status, would not defeat summary judgment.
In Carney, supra, 701 F.Supp. at 1098-99, the court stated, "It is not necessary for Dexter in order to prevail to demonstrate each of the foregoing factors weighs in favor of `non-employee' status.... Where there exist several indicia of employee status, the mere presence or absence of two or three of themwithout a reasoned balancing of the above factors cannot dictate the outcome of a summary judgment motion." Thus, despite the long-term status and exercise of some control by Dexter, summary judgment determining the salesman was an independent contractor was appropriate.
Likewise, in DaBronzo, supra, 232 F.Supp.2d at 315-18, the court granted summary judgment determining independent contractor status, despite the presence of some control, thirty years longevity, provision of exclusive worksite, and the presence of a contractual provision authorizing the manufacturer to require removal of any employee of the contractor, a right that the manufacturer exercised.
In Pukowsky, supra, 312 N.J.Super. at 183, 711 A.2d 398, we found that none of the twelve factors favored employee states, but noted that "[t]o the extent that the answer to any such factors may have indicated such a relationship, the overwhelming balance of factors clearly supports the trial court's finding that plaintiff was not an employee of Parkway." There, disposition was by involuntary dismissal at the end of plaintiff's case, pursuant to Rule 4:37-2(b). Id. at 172, 711 A.2d 398. The same standard applies to summary judgment motions. Brill, supra, 142 N.J. at 540, 666 A.2d 146.
In the case before us, some circumstances arguably point towards employee status, e.g., some control, provision of workplace, the contractual right of removal provision, and the alleged revocation of plaintiff's security clearance. To whatever extent these factors exist, their weight pales in comparison to that of the other factors. With respect to the most important Factor 1, any control exercised by the County is incidental to plaintiff's work as a nurse, and is for security, safety and administrative purposes. Only CHS controls plaintiff's activities as a nurse.
We are convinced that no rational factfinder, applying the twelve-factor Pukowsky test, could find that plaintiff was a County employee for LAD purposes. Summary judgment was properly granted in favor of the County.

III
Turning to plaintiff's remaining argument, she contends that the County assumed *1203 liability for protecting Plaintiff from sexual harassment under the LAD by undertaking all investigative efforts following plaintiff's report of harassment. Thus, plaintiff essentially asserts that, because the County conducted an investigation into her sexual-harassment allegations against its employee, Thomas, the County treated her like a County employee and is therefore liable to plaintiff under the LAD.
The trial judge rejected this argument, determining that the County had a legal obligation to investigate the allegations and that the County's fulfillment of that obligation did not result in plaintiff's classification as a County employee for LAD-liability purposes. We agree.
"If the employer had actual or constructive knowledge of the [sexual] harassment and did not promptly and effectively act to stop it, [the employer] will be liable" under the LAD. Woods-Pirozzi v. Nabisco Foods, 290 N.J.Super. 252, 268, 675 A.2d 684 (App.Div.1996) (citing Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 622, 626 A.2d 445 (1993)). The County was under a legal duty to investigate and resolve the allegations made by plaintiff against Thomas in order to avoid possible liability under the LAD. While plaintiff was not a County employee, her allegations put the County on notice about purported sexual harassment by Thomas and the possibility that such harassment may also have extended to County employees who had been or were still being harassed by Thomas, but had not yet complained. There was thus a basis for the County's investigation even though plaintiff was not a County employee. We reject this argument.
Affirmed.
NOTES
[1] Plaintiff's counsel represented at oral argument that CHS has gone out of business and is uninsured.
[2] Willie Sutton, the infamous bank robber, when asked why he robbed banks, replied, "because that's where the money is."